**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TERRANCE REMI

                       Plaintiff,

    - v -                                       Civ. No. 6:02-CV-1522
                                                (LEK/RFT)

COMMISSIONER OF SOCIAL SECURITY,
                            Defendant.

**APPEARANCES:**                               **OF COUNSEL:**

CONBOY, McKAY LAW FIRM                LAWRENCE D. HASSELER, ESQ.
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY                 WILLIAM H. PEASE
United States Attorney for the                Assistant United States Attorney
Northern District of New York
Attorney for the Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261

**RANDOLPH F. TREECE**
**UNITED STATES MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**

     In this action, Plaintiff Terrance Remi moves, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), for review of a decision by the Commissioner of Social Security denying his application

for Supplemental Security Income ("SSI").[1]  Based upon the following discussion, this Court

recommends that the Commissioner's decision denying Social Security benefits be **affirmed**.

---

[1] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed briefs, though oral argument was not heard. Dkt. Nos. 6 & 8.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

# I. BACKGROUND

## A. Claimant's History

Terrance Remi, age thirty-one at the time of the Administrative Law Judge Hearing, was born on June 5, 1970. Dkt. No. 5, Admin. Transcript [hereinafter "Tr."] at pp. 39 & 55. He lives alone in an apartment. *Id.* at pp. 42-43. Remi completed eleventh grade and obtained his General Equivalency Diploma. *Id.* at p. 39. At the time of the Hearing, he held a production assembly position in a sheltered workshop, but previously worked in lawn maintenance and as a dishwasher. *Id.* at pp. 40-42 & 47. Remi claims a disability due to anxiety, panic attacks, and an ankle injury. *Id.* at p. 363. Remi testified that he prepares his own microwavable meals, shops, and cleans, but his mother does his laundry and, at times, shops and cleans for him. *Id.* at p. 43. He claims his mother shops for him because he does not like to be around people and prefers not to enter stores. *Id.* at p. 48. He also states that he spends "a lot" of time alone. *Id.* at p. 42. His hobbies include hunting and fishing. *Id.* at pp. 43-44.

## B. Procedural History

On January 3, 2000, Remi protectively filed for SSI benefits alleging a disability onset date of August 1, 1992.[2] *Id.* at pp. 325-27. This application was denied initially and on reconsideration. *Id.* at pp. 292-95 & 298-301. On September 12, 2001, a Hearing was held before Administrative Law Judge ("ALJ") John R. Tarrant. *Id.* at pp. 36-49. On January 31, 2002, the ALJ issued an

---

[2] Remi filed several prior applications for SSI benefits. His first application was protectively filed in August 1993. Tr. at pp. 55-58. He was found to be disabled based on an anxiety disorder, but his benefits ceased in March 1997. *Id.* at pp. 73 & 85. Remi filed a request for reconsideration, which was denied in July 1997. *Id.* at pp. 106 & 117. Upon Remi's request, an Adminstrative Law Judge ("ALJ") held a hearing in October 1997 and, in March 1998, the ALJ issued an unfavorable decision. *Id.* at pp. 259-74. Remi filed a request for review to the Appeals Council, however, such request was denied in December 1998. *Id.* at pp. 275-79 & 280-81. In the interim, Remi protectively filed another application for SSI benefits in April 1998. *Id.* at pp. 317-23. This application was denied at the initial level in June 1999, and apparently not pursued. *Id.* at pp. 283 & 288-91. Subsequently, Remi protectively filed the application currently under review.

unfavorable decision against Remi.  *Id.* at pp. 14-23.  Then, on October 22, 2002, the Appeals Council concluded there was no basis under the Regulations to grant Remi's request for review, thus rendering the ALJ's decision the final determination of the Commissioner.  *Id.* at pp. 7-10. Exhausting all his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

### C.  Medical History

Plaintiff's medical records consist of treatment reports and opinions from various treating and/or examining physicians and other sources, including, 1) St. Lawrence Psychiatric Center, Michael F. Camillo, M.D., Treating Psychiatrist; 2) Muhammad Saleem, M.D., Psychiatrist, Consultative Examiner; 3) William Kimball, Ph.D., Consultative Examiner; 4) Abdul Hameed, M.D., Non-Examining Agency Residual Functional Capacity Assessment; 5) James Iport, M.D., Non-Examining Agency Residual Functional Capacity Assessment; 6) Gary Kolanchick, M.D. and Barbara Malow, R.N., Non-Examining Disability Review Team Certificate and Mental Residual Functional Capacity Assessment; 7) United Helpers Community Health Center, Mark A. Mazzye, Registered Physician's Assistant; 8) Charles J. Moehs, M.D., Consultative Examiner; 9) Robert Kasulke, M.D., Consultative Examiner; and 10) Patrick J. Lanigan, X-rays.  *Id.* at pp. 433-35 & 464-610.  The opinion of a vocational expert, Dennis P. Conroy, was also obtained.  *Id.* at pp. 395-96.

### 1.  Anxiety and Panic Attacks

Remi alleges that he suffers from anxiety and panic attacks.  During the period of August 9, 1999 to September 27, 2000, Remi was seen at St. Lawrence Psychiatric Center.  Tr. at pp. 461-75 & 502-04.  While there on August 9, 1999, Remi saw Michael F. Camillo, M.D., Plaintiff's treating

psychiatrist, who diagnosed Remi as suffering from panic disorder with agoraphobia,[3] and noted that Remi was receiving supportive psychotherapy and medication, including Xanax and Amitriptyline. *Id.* at pp. 461-62.  On February 21, 2000, Barbara Wood, a rehabilitation assistant, noted that Remi "has remained stable through [the] past year despite major stressors, [and he] continues with the same medication and diagnosis."  *Id.* at p. 467.  It was also noted that Remi has supportive relationships with his family and interested friends with whom he keeps in contact, and enjoys regular visitation with his daughters, though he remains "quite dependent" on his mother.  *Id.* at p. 464.  It was further noted that Remi "has no interest in . . . rehabilitation services and is resistive to exploring work options."  *Id.*  Nevertheless, on May 9, 2000, Registered Nurse Donna Morkis noted that Remi was working part-time in the greenhouse program.  *Id.* at p. 474.

On March 2, 2000, Remi was consultatively examined by Muhammad Saleem, M.D., a psychiatrist.  *Id.* at pp. 476-79.  Remi stated to Dr. Saleem that he has difficulty being around other people and experiences panic attacks almost every day.  *Id.* at p. 476.  Remi stated that during the attacks, his head goes "numb" and he experiences chest pain and rapid heartbeat.  *Id.*  Dr. Saleem noted that during the interview Remi was "cooperative but evasive at times."  *Id.* at p. 477.  It was also noted that Remi socializes with friends, fishes, hunts, cooks, washes dishes, cleans, and does laundry, but he does not like to shop "as he becomes anxious in the stores."  *Id.* at p. 478.  Dr. Saleem diagnosed Remi as suffering from panic disorder with agoraphobia and concluded that Remi's prognosis for employment "is guarded due to physical problems, psychiatric symptomatology, and a poor work history."  *Id.* at 478-79.

---

[3] Agoraphobia is defined as an "intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 38 (28th ed. 1994).

On May 25, 2000, Abdul Hameed, M.D., State Agency Consultant, reviewed Remi's medical record and opined, without examining him, that Remi was moderately limited with regard to the following abilities: performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. *Id.* at pp. 534-37. Dr. Hameed indicated that Remi was not significantly limited with regard to any other mental abilities. *Id.* Dr. Hameed also completed a Psychiatric Review Technique Form in which he noted under Listings 12.06 (Anxiety Related Disorders) and 12.09 (Substance Addiction Disorders) that Remi had "slight" limitations in activities of daily living, as well as maintaining social functioning. *Id.* at pp. 489-92. Remi was limited "often" with regard to concentration, persistence or pace resulting in failure to complete tasks in a timely manner but had no episodes of deterioration or decompensation in work or work-like settings. *Id.* at p. 492.

On September 21, 2000, Remi was consultatively examined by William Kimball, Ph.D. *Id.* at pp. 497-501. Plaintiff stated to Dr. Kimball that it is difficult to be around people because of his anxiety and he experiences panic attacks often, but the attacks are less intense if he is alone. *Id.* at pp. 498 & 500. Remi reported that when he experiences an attack, "he feels like the world is closing in[,] his heart races [and] he feels like he is quite faint." *Id.* Dr. Kimball diagnosed Remi as suffering from social phobia.[4] *Id.* at p. 501. He also opined that Remi's prognosis was "quite guarded" and noted that Remi has shown partial relief "at best" from outpatient treatment. *Id.* Dr. Kimball further opined that "it is exceptionally difficult" for Remi to be around people and he can

---

[4] Social phobia is defined as "any phobic disorder involving fear and avoidance of social situations in which the individual fears that he will be exposed to possible embarrassment and humiliation, e.g., fears of speaking, performing in public." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1281 (28th ed. 1998).

only work if he is "very isolated" from others. *Id.* Dr. Kimball assigned Remi a Global Assessment of Functioning ("GAF") score of 40.[5] *Id.*

On September 27, 2000, Dr. Camillo conducted another psychiatric evaluation and kept Plaintiff on Xanax and Amitriptyline. *Id.* at p. 502. He again diagnosed Plaintiff as having panic disorder with agoraphobia and assigned him a GAF score of 60. *Id.* at pp. 502 & 504. Subsequently, on November 6, 2000, James Iport, M.D., State Agency Consultant, completed a Psychiatric Review Technique Form without examining Remi, and indicated that under Listings 12.06 and 12.09, Remi was mildly limited in activities of daily living, as well as moderately limited in maintaining social functioning, and concentration, persistence, or pace. *Id.* at pp. 520-33. There was insufficient evidence to determine whether Remi had repeated episodes of decompensation. *Id.* at p. 530.

On September 10, 2001, Dr. Camillo completed a Medical Source Statement regarding Plaintiff's ability to do work related activities in which it was noted that the information contained in the Statement was obtained from individuals at the sheltered workshop where Remi worked. *Id.* at pp. 570-71. Dr. Camillo indicated that Remi had a "slight" restriction in his abilities to understand, remember, and carry out detailed instructions, as well as make judgments on simple work-related decisions. *Id.* It was also noted that Remi had a "moderate" limitation in his abilities to interact appropriately with supervisors and co-workers, and to respond appropriately to changes

---

[5] The Global Assessment of Functioning scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").

A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR at 34. A GAF score between 51 and 60 indicates the existence of moderate mental health symptoms or moderate difficulties in social, occupational, or school functioning. *Id.*

in a routine work setting.  *Id.* at p. 571.  Mark Mazzye, a Registered Physician's Assistant, also completed a Medical Source Statement on November 27, 2001.  Mazzye indicates, *inter alia*, that Remi was limited to lifting and/or carrying twenty pounds occasionally and walking six hours in an eight-hour workday.  *Id.* at pp. 595-96.  Furthermore, Remi was limited in his abilities to push, pull, and reach, and had some postural, manipulative, and environmental limitations.  *Id.* at pp. 596-98.

 In the interim, on November 1, 2001, Gary Kolanchick, M.D., and Barbara Malow, R.N., from the St. Lawrence Department of Social Services, completed a Disability Review Team Certificate and Psychiatric Review Technique Form and submitted a Mental Residual Functional Capacity ("RFC") Assessment.  *Id.* at pp. 599-600.  The Assessment, which was signed by Malow, indicates that Remi was "moderately" limited with regard to various mental abilities, and "markedly" limited with regard to other abilities.  *Id.* at pp. 601-02.  Based upon the evaluation, Kolanchick and Malow determined Plaintiff was disabled.  *Id.* at p. 599.

## 2.  Ankle Injury

In regards to his claimed disability based upon an injury to his right ankle, on March 18, 1999, Remi was consultatively examined by Charles J. Moehs, M.D.  *Id.* at pp. 433-35.  Dr. Moehs noted that Remi fractured his ankle after falling on the ice in January 1997, wore a cast, and underwent physical therapy for about one year.  *Id.* at p. 433.  Remi told the doctor that the pain was intermittent and limited him from prolonged walking, but Dr. Moehs noted that Remi "does keep himself busy" with activities, such as reading, housework, and "some walking."  *Id.*  Dr. Moehs further noted that Plaintiff had "mild discomfort in the lateral posterior aspect of the ankle."  *Id.* at p. 434.  Dr. Moehs observed that Remi had an "occasional limp" in that after the exam, Remi "started with no limp but then limped to the reception desk."  *Id.*  Then Dr. Moehs observed Remi

walking outside the office in a "brisk manner with no limp." *Id.* Dr. Moehs concluded that Remi had "limited to no impairment of the right ankle with some increase in size of the ankle when compared to the left with history of old fracture." *Id.* Also, on March 18, 1999, Patrick J. Lanigan, M.D., reviewed images of Remi's right ankle and noted that there was "some soft tissue swelling about the lateral malleolus." *Id.* at p. 435. Dr. Lanigan concluded that there was subtle asymmetry of the ankle mortise and some mild soft tissue swelling, but no fracture. *Id.*

On May 2, 2000, Remi was consultatively examined by Robert Kasulke, M.D. *Id.* at pp. 480-84. Dr. Kasulke noted that Remi complained of pain in his right ankle and "occasionally" wears an air cast. *Id.* at p. 480. Dr. Kasulke found that both ankles had a normal range of motion and that there was no deformity of the right ankle. *Id.* at p. 481. Dr. Kasulke concluded that Remi "basically [had] a normal examination of the orthopedic system" and that an x-ray was "consistent with [an] old healed fracture." *Id.* Then, on July 6, 2000, Remi complained of continued foot and ankle pain to Mazzye. *Id.* at p. 551. In response, Mazzye prescribed Darcovet. *Id.*

Subsequently, on October 23, 2000, Remi was again examined by Dr. Kasulke. *Id.* at pp. 507-11. It was noted that Remi "occasionally" wore an air cast on his right ankle when he is walking long distances. *Id.* at p. 508. It was also noted that Remi had a "very slight limp favoring his left leg." *Id.* Dr. Kasulke found no deformity nor swelling of either ankle and concluded that Remi was "status post fracture of his right ankle" and that the examination of his ankle was normal. *Id.* On November 6, 2000, Dr. Hameed completed a Physical Residual Functional Capacity Assessment. *Id.* at pp. 512-19. He indicated that Remi had no exertional, postural, manipulative, visual, communicative, nor environmental limitations. *Id.*

### 3. Other Impairments

In addition to the foregoing, Remi was treated principally by Mr. Mazzye for Type II Diabetes, hypertension, cholesterol, and respiratory conditions from May 2000 to November 2001. *Id.* at pp. 540-68 & 594-98.  On October 25, 2001, Mr. Mazzye opined in a letter addressed to the Department of Social Services that Remi was suffering from an exacerbation of Chronic Obstructive Pulmonary Disease ("COPD") for which he had been hospitalized.  *Id.* at p. 594.  Thus, in Mr. Mazzye's opinion, Remi was unable to work.  *Id.*

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3),[6] the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a

---

[6] Section 1383(c)(3) makes section 405(g) applicable to the SSI program and provides the basis for this Court's jurisdiction and limitations of its review.

reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's

decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

## B. Determination of Disability

The standards for determining disability under Title II, 42 U.S.C. § 423(d) (Social Security

Disability Insurance ("SSDI")), and Title XVI, 42 U.S.C. § 1382c(a)(3) (Supplemental Security

Income ("SSI")), are identical, so that "decisions under these sections are cited interchangeably."

*Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983).  To be

considered disabled within the meaning of the Social Security Act, a plaintiff must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

1382c(a)(3)(A).  A disabling impairment is defined as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." *Id*. at § 1382c(a)(3)(D).  Furthermore, the claimant's

physical or mental impairments must be of such severity

> that he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

*Id*. at § 1382c(a)(3)(B).

In this regard, "work which exists in the national economy" means "work which exists in

significant numbers either in the region where such individual lives or in several regions of the

country." *Id*.

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis

set forth in the Social Security Administration Regulations.  20 C.F.R. § 416.920.  At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity."  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. § 416.920(a)(4)(i).  If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations.  *Id.* at § 416.920(a)(4)(iii).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment, the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity.  *Id.*  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity[7] to perform his or her past relevant work despite the existence of severe impairments.  20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  20 C.F.R. § 416.920(f); *Berry v. Schweiker*, 675 F.2d at 467.

Initially, the burden of proof lies with the claimant to show that his or her impairment(s)

---

[7] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 416.945(a).

prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy.  *Id.*; *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990).  In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills.  20 C.F.R. § 416.920(a)(4)(v); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C.  ALJ Tarrant's Findings

Using the five-step disability evaluation, ALJ Tarrant found that 1) Remi had not engaged in any substantial gainful activity since 1992; 2) Remi has a combination of severe medically determinable impairments, namely panic disorder and social phobia; 3) Remi's severe impairments did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) Remi has the RFC to lift or carry fifty pounds occasionally, as well as stand, walk, or sit about six hours in an eight-hour workday, but is limited to low stress work involving simple instructions, no production quotas, no public interaction, and occasional interaction with coworkers; however, he can perform his past relevant work as a dishwasher and therefore was not disabled.  Tr. at pp. 14-23.  After reviewing the administrative transcript, the Court finds that the ALJ applied the correct legal standards and his findings are supported by substantial evidence of record.

### D.  Remi's Contentions

Plaintiff contends that the ALJ's decision denying benefits should be reversed and/or remanded because (1) the ALJ failed to properly examine and discuss certain medical records; (2) the ALJ did not properly follow the Treating Physician's Rule; (3) at Steps Two and Three, the ALJ erred by improperly assessing Plaintiff's functional limitations and by finding that his impairments did not meet or equal an impairment in the Listing 12.06; (4) at Step Three, the ALJ erred when he did not find Plaintiff was mentally retarded under Listing 12.05(C); and (4) at Step Four, the ALJ erred in finding that Remi retains the RFC to perform medium work and is able to perform his past work as a dishwasher.  Dkt. No. 6, Pl.'s Br.  The Court will consider each of Remi's contentions *seriatim*.

### 1.  Examination and Discussion of Medical Records

Remi argues that the ALJ failed to consider "most" of the medical records in contravention of the "special technique" utilized when evaluating mental impairments, which requires the ALJ to first evaluate a claimant's pertinent symptoms, signs, and laboratory findings.  Pl.'s Br. at pp. 13-14; *see also* 20 C.F.R. § 416.920a(b)(1).  In conjunction, Remi also argues that in failing to consider "most" of the medical records, the ALJ failed to satisfy 20 C.F.R. § 416.912(d), which requires an ALJ to develop a claimant's complete medical history for at least a twelve-month period preceding the month in which the application is filed unless the alleged disability began less than twelve months before the filing.  Pl.'s Br. at pp. 13-14.

Although Plaintiff states that the ALJ did not reference many of the medical records that support his contention of full disability, an ALJ is not obligated to "specifically address each piece of evidence in his decision."  *Jones v. Barnhart*, 2004 WL 3158536, at *6 (E.D.N.Y. Feb. 3, 2004) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  "It is enough that the ALJ noted that

*-13-*

he carefully considered the exhibits presented in evidence in reaching his decision, . . . and that the crucial factors in any determination [are] set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." *Id.* (alterations in original and citations omitted). In this case, the ALJ fulfilled his duty when he stated he "reviewed all of the evidence of record" and "considered the medical evidence." Tr. at pp. 17 & 21.

## 2. Treating Physician's Rule

Plaintiff alleges that the ALJ wrongfully assigned "little" or "no" weight to those medical records that substantiate the disabling character of his panic disorder and social phobia in contravention of the "special technique," which requires that if a medically determinable mental impairment(s) is determined, the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) must be specified and findings must be documented. 20 C.F.R. § 416.920a(b)(1).

In assessing the weight to be given to the various medical opinions in the record, the ALJ gave the determination made by Dr. Kolanchick and Nurse Malow of the state disability unit "little weight" and Mazzye's functional capacity assessment was "not given any significant weight." Tr. at p. 21. In regards to the state disability unit, which found Plaintiff disabled, the ALJ assigned "little weight" to this opinion because the reviewers did not examine Remi, identify reports reviewed, or provide a basis for their findings. *Id.* Under the Regulations, generally more weight is given to the opinion of a source who has examined a claimant and who is a treating source. *See* 20 C.F.R. §§ 416.927(d)(1) & (2). More importantly, however, a decision by a governmental agency as to whether a claimant is disabled is not binding upon the Commissioner since a determination of disability must be made pursuant to social security law, not the rules of the

*-14-*

governmental agency.  20 C.F.R. § 416.904.  Therefore, the ALJ did not err by assigning "little" weight to this opinion because the reviewers did not examine Remi and were not treating sources. *See* Tr. at p. 599.  Moreover, the ultimate determination of whether a person meets the statutory definition of disability is left with the Commissioner and, thus, the ALJ is under no duty to afford controlling weight to any opinion as to such determination.  20 C.F.R. § 416.927(e)(1).

With regard to the functional capacity assessment completed by Mazzye, the ALJ assigned no significant weight to this assessment because Mazzye, as a physician's assistant, is not a treating physician and therefore, the assessment "is not considered expert opinion evidence."  Tr. at p. 21. Under the Regulations, though a physician's assistant is not listed as an "acceptable medical source" who can give a medical opinion establishing an impairment, the physician assistant's opinion may be used "[i]n addition to evidence from the acceptable medical sources list . . . to show the severity of [a claimant's] impairment(s)[.]"  20 C.F.R. §§ 416.913(a) & (d)(1).  Accordingly, the ALJ was not obligated to assign controlling weight to any opinion rendered by Mazzye.  *See id.*; *Colondres v. Barnhart*, 2005 WL 106893, at *6 n. 97 (S.D.N.Y. Jan. 18, 2005) (noting that a physician's assistant "is not an acceptable medical source and such opinion is never entitled to [controlling] weight" as is afforded to a treating physician).  Furthermore, the ALJ did find that Plaintiff suffered from panic disorder and social phobia, as diagnosed by his treating psychiatrist and other medical personnel.  *See* Tr. at pp. 19, 461-62, 479, & 501.  Thus, Plaintiff's claim that the ALJ did not address any records that substantiate Plaintiff's panic disorder and social phobia is without merit.

### 3.  Step Two and Three - Functional Limitations and Listing 12.06

Remi contends that the ALJ failed to assess his anxiety disorder in accordance with 20 C.F.R. § 416.920a.  Pl.'s Br. at pp. 13-17.  The Regulations require the ALJ to use a "special

technique" to evaluate alleged mental impairments.  *See* 20 C.F.R. § 416.920a(a).  At Step Two of the five-step procedure detailed above, the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether they are "severe."  *Id.* at § 416.920a(a)(1).  For this purpose, the claimant's limitations in four "broad functional areas" are rated along a five-point scale ranging from no limitation to extreme limitation.  *Id.* at § 416.920a(c)(4).  The four areas consist of the following: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[8]  *Id.*  A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe.  *Id.* at § 416.920a(d)(1).  If the impairment is severe, then at Step Three the ALJ must determine whether the impairments meet or are the equivalent to a listed mental disorder.  *Id.* at § 416.920a(d)(2).  If the impairment is not listed, then the ALJ must assess the claimant's mental RFC.  *Id.* at § 416.920a(d)(3).

In this case, the ALJ first found no impairment in Remi's activities of daily living.  Tr. at p. 20.  He next determined that Remi's social functioning was moderately impaired, noting that "[t]here is evidence to suggest that the claimant's interaction with coworkers and the public should be minimized."  *Id.*  The ALJ then found that Remi's concentration, persistence, or pace, was mildly impaired because Remi's social phobia "may inhibit his concentration during periods of distress caused by interaction with others."  *Id.*  Lastly, he found no evidence that Remi ever experienced

---

[8] Decompensation refers to the "failure of defense mechanisms resulting in the progressive personality disintegration."  Dorland's Illustrated Medical Dictionary 432 (28th ed. 1994).

With regard to the functional areas, the first three areas are rated on a five-point scale: "none," "mild," "moderate," "marked," and "extreme."  The fourth area is measured on a four-point scale: "none," "one or two," "three," and "four or more."  20 C.F.R. § 416.920a(c)(4).  The four functional areas are used in Paragraph B of the mental impairment listings in the Appendix, therefore, they are often referred to as the "B Criteria."  *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 437 n.7 (S.D.N.Y. 2003).

an episode of decompensation.  *Id.*  Based on the foregoing, the ALJ found that Remi had panic disorder with social phobia, but that the impairment did not meet or equal a listed mental disorder. *Id.*  Thus, the ALJ was required to assess Remi's mental RFC.  *See* 20 C.F.R. § 416.920a(d)(3).  The mental RFC is used to "determine whether the claimant can meet the mental demands of past relevant work in spite of the limiting effects of [his] impairment and, if not, whether the claimant can do other work, considering [his] remaining mental capacities and [his] occupational base, age, education, and work experience."  *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003) (citing Social Security Regulation ("SSR") 85-15, 1985 WL 56857, at *4, *Titles II and XVI: Capability to do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments* (S.S.A. 1985)) (further citation omitted).

With regard to the first functional area, activities of daily living, the ALJ found that Remi had no functional limitations in this area.  Tr. at p. 20.  Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 C(1).

Although there are medical records that suggest at least some degree of impairment in this functional area, there is also evidence that Plaintiff had the ability to do many of the daily living activities.  For instance, Remi's treating psychiatrist, Dr. Camillo, diagnosed Remi as suffering from panic disorder with agoraphobia.  Tr. at pp. 462 & 503; *see supra* note 3 (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, which defines agoraphobia as "intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable").  Consultative examiner, Dr. Saleem, also diagnosed Remi

as suffering from panic disorder with agoraphobia and noted that Remi complained that he has difficulty being around other people and experiences panic attacks. Tr. at pp. 476 & 479. Dr. Saleem further noted that Remi "does not like to go . . . shopping as he becomes anxious in the stores." *Id.* at p. 478. However, Dr. Saleem also indicated that Plaintiff takes care of his personal needs and does household work, including cooking, dishwashing, cleaning, and doing the laundry. *Id.*

Similar to the diagnoses of Drs. Camillo and Saleem, consultative examiner, Dr. Kimball, diagnosed Remi as suffering from social phobia. *Id.* at p. 501; *see supra* note 4 (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, which defines social phobia as "any phobic disorder involving fear and avoidance of social situations in which the individual fears that he will be exposed to possible embarrassment and humiliation, e.g., fears of speaking, performing in public"). Plaintiff told Dr. Kimball that it is difficult to be around people, he does not "go around" many people because of his anxiety, and he is considered to be the hermit of his house. *Id.* at pp. 498-499 & 501. Remi also relayed to Dr. Kimball that he experiences panic attacks around people, which are more intense than when he is alone. *Id.* at p. 500. Upon questioning by Dr. Kimball, Remi stated that he could go shopping or walking if no others were around, but he "does not go food shopping very much because of his anxiety. He states that his mother and sister go for him . . . [because] it is too much." *Id.* at pp. 500 & 501. However, in June 1999, Dr. Arlene Reed-Delaney completed a Psychiatric Review Technique and found Plaintiff had no restrictions of activities of daily living. *Id.* at p. 454. Subsequently in 2000, the State Agency Consultants, Drs. Hameed and Iport, indicated that Remi had "slight" or "mild" limitations in activities of daily living. *Id.* at pp. 492 & 530.

Then, during the Hearing with the ALJ, Remi testified that his mother does some of his shopping because he does not like to go into stores and be around people and that his mother also does his laundry.  *Id.* at p. 48.  Remi also stated that he experiences anxiety attacks when he is around a lot of people.  *Id.* at p. 45.  Notwithstanding, Plaintiff further testified that he cooks for himself using a microwave, sometimes goes shopping, cleans his own living space – though his mother aides him on occasion –, hunts and fishes, hangs out with friends, and takes the bus.  *Id.* at pp. 43-47.

With regard to the second functional area, social functioning, the ALJ found that Remi had a moderate degree of limitation in this area.  *Id.* at p. 20.  The ALJ added that "[t]here is evidence to suggest that the claimant's interaction with coworkers and the public should be minimized."  *Id.* Social functioning refers to the capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). Social functioning may be impaired by, for example, a fear of strangers, avoidance of interpersonal relationships, or social isolation.  *Id.*  There is substantial evidence, including that of Plaintiff's treating psychiatrist, to show that there was a slight or moderate degree of limitation in this area. *See* Tr. at pp. 454, 457, 492, 530, 535, & 570-71.

In regards to the third functional area, concentration, persistence, or pace, the ALJ found that Remi had a mild degree of limitation.  *Id.* at p. 20.  Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).  The ALJ added that Remi's "social phobia may inhibit his concentration during periods of distress caused by interaction with others."  Tr. at p. 20.

-*19*-

Though the ALJ did not specifically identify which medical records he relied on to make his decision, the ALJ stated he considered all the medical evidence.  The medical records support a finding of mild or moderate limitation in this area.  Dr. Reed-Delaney found on one occasion that Remi never had any deficiency and, except for Plaintiff's ability to carry out detailed instructs, for which she indicated Plaintiff had a moderate limitation, Plaintiff was not significantly limited in any other of the sustained concentration and persistence categories.  *Id.* at pp. 454 & 456-57.  Dr. Hameed indicated in a mental RFC that Plaintiff was "often" limited with regard to deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner.  *Id.* at p. 492.  He also noted that Remi was "moderately" limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, though the evaluation further revealed that he was not significantly limited in any of the other sustained concentration and persistence categories.  *Id.* at p. 534.  Dr. Iport indicated that Remi had "moderate" difficulties in maintaining concentration, persistence, or pace. *Id.* at p. 530.  In addition, the mental RFC Assessment completed by Nurse Malow indicates that Remi was moderately or markedly limited and in several sustained concentration and persistence abilities.[9]  *Id.* at pp. 601-602.  Lastly, Remi testified at the Hearing that he often starts eight to ten things around the house to keep busy but he "never finish[es] one." *Id.* at p. 48.

Finally, in terms of the fourth functional area, episodes of decompensation, the ALJ stated

_____

[9] It was indicated that Remi was "moderately" limited in carrying out very short, simple, and detailed instructions as well as maintaining attention and concentration for extended periods. Tr. at 601. Remi was "markedly" limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions;  complete a normal workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at pp. 601-02.

the evidence indicated that the claimant has no such episodes.  *Id.* at p. 20.  Although the ALJ did not specifically state what evidence he relied on in making his decision, the medical records confirm that there is substantial evidence to show that there were no episodes of decompensation.  *See id.* at pp. 454, 492 & 530.

The Second Circuit has stated that when a court reviews the record to determine if substantial evidence exists, the record as a whole must be reviewed.  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (quoting *State of New York v. Sec'y of Health and Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990)).  "This means that in assessing whether the evidence supporting the [Commissioner's] position is substantial, we will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it."  *Id.* (quoting *State of New York v. Sec'y of Health and Human Servs.*, 903 F.2d at 126).  However, "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder."  *Id.* (citing, *inter alia*, *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)).  In assessing the evidence, there was substantial evidence to show that Plaintiff had a moderate limitation in social functioning and no episodes of decompensation.  As for the areas of activities of daily living, there is substantial evidence that Plaintiff could have either no limitation or a mild limitation.  Similarly, there is substantial evidence that Plaintiff could have either a mild or moderate limitation in the area of concentration, persistence, or pace.  In that case, the determination is to be made by the factfinder, the ALJ.

In addition to Plaintiff's claim that the ALJ erred in determining the functional limitations, Plaintiff contends the ALJ erred by failing to find that his anxiety met or medically equaled the listing level requirement for anxiety related disorders set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.  Pl.'s Br. at pp. 19-22.  In order to be considered disabled due to an anxiety related

disorder at Step Three of the disability evaluation process, a claimant must meet the requirements of § 12.06.  In determining whether a mental impairment exists, the ALJ must review the record for any evidence of symptoms, signs, or laboratory findings indicating a mental impairment.  20 C.F.R. § 416.920a(b).  Symptoms are the claimant's description of their impairments, and "signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source." *Id.* at Pt. 404, Subpt. P, App. 1, § 12.00(B).  It is the claimant's burden to furnish evidence of the impairment from acceptable medical sources, which include physicians and psychologists.  *Id*. at § 416.913(a)(1)-(2).  Evidence from other medical sources as well as non-medical sources may also be considered.  *Id*. at § 416.913(d).  Therefore, in order to meet the standard set by § 12.06, a claimant must prove that his disability meets the requirements of subsections A and B, or subsections A and C, which are the following:

A.  Medically documented findings of at least one of the following:
　　1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
　　　　a. Motor tension; or
　　　　b. Autonomic hyperactivity; or
　　　　c. Apprehensive expectation; or
　　　　d. Vigilance and scanning; or
　　2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
　　3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
　　4. Recurrent obsessions or compulsions which are a source of marked distress; or
　　5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
AND
B.  Resulting in at least two of the following:
　　1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

OR

C.   Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

Plaintiff argues that Remi satisfies the Part A listing under § 12.06.  The ALJ concluded that Remi's diagnoses of panic disorder with social phobia "satisf[ied] the 'A' criteria for Listings 12.06."  Tr. at p. 20.  Therefore, Remi's argument on this point is moot.  *See* Pl.'s Br. at p. 19. However, the ALJ stated that he did not find the criteria in § 12.06(B) to be met.  Tr. at p. 20.

In order to satisfy § 12.06(B), a claimant must prove that his medically determinable impairment results in two out of four listed restrictions.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.06(B)(1)-(4).  Remi contends that he met the criteria under 12.06(B) because his anxiety resulted in a marked restriction in his activities of daily living, as well as marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  As discussed, the ALJ found that Remi had no functional limitations in the area of activities of daily living, his social functioning was moderately impaired, his concentration, persistence, or pace was mildly impaired, and he had no episodes of decompensation.  Tr. at p. 20.

The ALJ did not err in his determination that Plaintiff does not meet the criteria in § 12.06(B).  In regards to § 12.06(B)(1), substantial evidence exists to show that Plaintiff had either no or at the most a mild restriction of activities of daily living.  As required under § 12.06(B)(1), there must be a "marked" restriction, which is defined as "more than moderate but less than

extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  Plaintiff's limitation in this functional

area did not rise to the level of a "marked" restriction as the degree of limitation did not "interfere

seriously with [his] ability to function independently, appropriately, effectively, and on a sustained

basis." *Id.* (citing, *inter alia*, 20 C.F.R. § 416.920a).  Like that of the area of activities of daily

living, under § 12.06(B)(2), there must be "marked difficulties in maintaining social functioning."

There is substantial evidence that Plaintiff only has a moderate limitation in the area of social

functioning, not a marked limitation.  In the area of concentration, persistence, or pace, under §

12.06(B)(3), a claimant must have deficiencies in this area resulting in frequent failure to complete

tasks in a timely manner.  Substantial evidence shows that Plaintiff does have either a mild or

moderation limitation in concentration, persistence, or pace.  Thus, Plaintiff seemingly meets the

criteria under § 12.06(B)(3).  As for §12.06(B)(4), a claimant must have repeated episodes of

deterioration or decompensation in work or work-like settings.  Substantial evidence exists that

Plaintiff experienced no episodes of decompensation.  As noted previously, in order to meet the

criteria under Listing 12.06, Plaintiff must meet the requirements of both subsections A and B.

Although Plaintiff satisfies subsection A, he fails to meet at least two of the criteria under subsection

B.[10]

Accordingly, the ALJ applied the correct legal standard and substantial evidence supports

the ALJ's determination.

### 4.  Step Three - Mental Retardation

Remi contends that the ALJ erred by failing to find that his condition met or medically

equaled the listing level requirement for mental retardation set forth in 20 C.F.R. Part 404, Subpart

---

[10] In addition, substantial evidence shows that Plaintiff does not meet the criteria under subsection C.  Tr. at p. 20; *see also supra* Parts I.C & II.D.3.

P, App. 1, 12.05(C).  Pl.'s Br. at pp. 18-19.  Listing 12.05(C) requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (2002).

Remi's argument is based on evidence that relates to his prior applications.  In fact, Remi admits that listing 12.05(C) was the basis for his prior award of benefits.  Pl.'s Br. at pp. 18-19. Furthermore, the medical records cited by Plaintiff are from 1993 and 1997 and indicate an IQ of 75, not 71 as alleged by Plaintiff.  *See* Tr. at pp. 109-16 & 210-14.  The ALJ is required to develop a complete medical history for at least the twelve months prior to the filing of the application.  20 C.F.R. 416.912(d).  Here, there is no indication that Plaintiff ever raised the issue of mental retardation as an impairment.  Based upon the disability actually raised, there was no reason for the ALJ to go beyond the twelve month period and inquire if Remi was mentally retarded.[11]

Based on the foregoing, the Court finds that there is no merit to this contention.  Thus, there was no error on the part of the ALJ with regard to Listing 12.05(C).

### 5.  Step Four - RFC and Past Work Experience

Plaintiff asserts that the ALJ erred by finding that he was capable of performing his past work as a dishwasher because the ALJ's RFC determination lacks support from the record and because the ALJ did not determine the functional demands associated with Remi's past relevant

---

[11] Even if the ALJ had examined those records, there is arguably substantial evidence to show Plaintiff was not diagnosed as suffering from mental retardation at the time the application was filed nor at the time the ALJ rendered his decision.  Plaintiff's treating psychiatrist, Dr. Camillo, noted that Remi's intelligence "was probably in the average range."  Tr. at p. 503.  Similarly, consultative examiner, Dr. Saleem, opined that Remi's "fund of information and intelligence was average."  *Id.* at p. 478.  Dr. Kimball also found that Remi had a "good fund of knowledge."  *Id.* at p. 500.  Dr. Hameed further indicated in the Psychiatric Review Technique form that there was no evidence of mental retardation.  *Id.* at p. 489.

work.  Pl.'s Br. at pp. 22-25.  Plaintiff also argues that the hypothetical questions posed to the vocational expert were inaccurate because they did not "adequately encapsulate Plaintiff's limitations."  *Id.* at p. 23.

"[I]n order to determine at step four whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities."  *Kerulo v. Apfel*, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (citations omitted); *see also* SSR 82-61, 1982 WL 31387, *Titles II and XVI: Past Relevant Work–The Particular Job or the Occupation as Generally Performed* (S.S.A. 1982); SSR 82-62, 1982 WL 31386, *Titles II and XVI: A Disability Claimant's Capacity to do Past Relevant Work, In General* (S.S.A. 1982).  RFC is what a claimant is capable of doing despite his or her impairments.  20 C.F.R. § 404.1545(a). Once the demands of the claimant's past relevant work are ascertained, the ALJ must identify the claimant's ability to perform the specific work-related abilities on a function by function basis.  SSR 96-8p, 1996 WL 374184, at *1, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims* (S.S.A. 1996).  Moreover, "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining skill level; exertional demands and nonexertional demands of such work."  SSR 82-62, 1982 WL 31386, at *3, *Titles II and XVI: A Disability Claimant's Capacity to do Past Relevant Work, In General* (S.S.A. 1982).

As noted previously, the ALJ found that Remi retains the residual functional capacity "to lift or carry 50 pounds occasionally [and] to sit, stand and walk for six hours each in an eight-hour workday."  Tr. at p. 21.  The ALJ further stated that Plaintiff was "limited to low stress work

involving simple instructions, no production quotas, no interaction with the public and occasional interaction with coworkers." *Id.* The ALJ then determined that, in light of these limitations, Remi could perform her past relevant work as a dishwasher. *Id.* at p. 22. The ALJ's RFC assessment is supported by substantial evidence.

In Plaintiff's Disability Report, Plaintiff stated that in his capacity as a dishwasher, he would walk and stand for approximately three hours a day and that he stood approximately five hours a day. *Id.* at p. 338. He would also bend and reach occasionally, lifted up to twenty pounds, and frequently lifted and/or carried up to ten pounds. *Id.* A Residual Functional Capacity Assessment completed in June 1999 noted that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand, sit, and/or walk for six hours in an eight hour workday, and Plaintiff has an unlimited ability to push and/or pull. *Id.* at p. 440. The same month, Plaintiff's treating psychiatrist, Dr. Camillo, stated Plaintiff was capable of working or going through vocational rehabilitation. *Id.* at p. 460. In May 2000, in another Residual Functional Capacity Assessment, Dr. Hameed found Plaintiff had no exertional limitations. *Id.* at p. 513. Subsequently, in November 2001, Mr. Mazzye completed a Medical Source Assessment wherein he found Plaintiff could occasionally lift and/or carry twenty pounds, walk for six hours in an eight hour workday, and that the time period for which he could sit was not affected by the impairment. *Id.* at pp. 595-96.[12]

In making his decision regarding Plaintiff's capability to perform his past work experience as a dishwasher, the ALJ relied on a vocational expert, Dennis Conroy. *Id.* at p. 22. As stated in the Regulations, "vocational experts . . . or other resources, such as the 'Dictionary of Occupational

---

[12] Other evidence in the record also supports the ALJ's conclusion. *See* Tr. at pp. 433-34, 439-46, 454, 456-58, 474, 479, 499, 501, 520-31, 534-36, & 569-71.

Titles'" may be used to obtain evidence needed to determine if a claimant can perform his past relevant work experience based on his residual functional capacity. 20 C.F.R. § 416.960(b)(2). "A vocational expert . . . may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." *Id.* Furthermore, "a vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." *Id.*

For an ALJ to properly rely on the opinion of a vocational expert, "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments." *Juleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting *Totz v. Sullivan,* 961 F.2d 727, 730 (8th Cir. 1992)) (further citation omitted). If the ALJ fails to pose hypothetical questions that do "not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Id.* (citing *Morse v. Shalala*, 16 F.3d 865, 874 (8th Cir. 1994)). In garnering an opinion, the ALJ asked Conroy to assume that the following facts: 1) the claimant is thirty years old with an eleventh grade education and work experience as a dishwasher for a little over four months in 1992; 2) the claimant has been diagnosed with panic disorder and social phobia; 3) the claimant is able to sit, stand, and walk for six hours in an eight hour day, and lift, carry, push and pull fifty pounds occasionally; and 4) the claimant is limited to low stress work involving simple instructions, no production quotas, no interaction with the public and occasional interaction with coworkers. *Id.* at

p. 393.  The facts to be assumed by Conroy were consistent with evidence in the record.  Based on those assumptions, Conroy found Plaintiff could be employed as a dishwasher, as well as laborer in a store or a cleaner in a hospital.  *Id.* at pp. 395-96.  Conroy further noted the number of each of the three jobs occurring in the national economy as well as in the central New York region.  *Id.*

The ALJ considered Conroy's opinion to be that of an expert and afforded it great weight. *Id.* at p. 22.  In view of Conroy's opinion taken in conjunction with other medical evidence considered, we find that the ALJ's decision that Plaintiff was not disabled and could perform his past relevant work as a dishwasher is supported by substantial evidence.  *See generally Nix v. Sullivan*, 1991 U.S. App. Lexis 13707, at *8 (2d Cir. 1991) (unpublished opinion) (citing *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)) (stating "[t]he testimony of a vocational expert can constitute substantial evidence to support a conclusion that a claimant is not disabled").

## III.  CONCLUSION

In light of the foregoing discussion, it is clear that in finding Remi was not disabled, the ALJ applied the correct legal standards and his factual findings were supported by substantial evidence. Thus, this Court recommends that decision be upheld.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).


Date:   June 27, 2007
        Albany, New York


_____
RANDOLPH F. TREECE
United States Magistrate Judge